Our last case for argument today is Gonzalez v. Education, appeal number 23-2001. Mr. Berger, when you're ready. Okay, thank you. So the issue before the court today is what is the proper measure of a conduct unbecoming charge? Of a which? Of a conduct unbecoming charge, which is the only narrow issue in this proceeding. We have a situation, especially when you have a good faith actor. We know that the findings of fact in this case are not disputed. We know that these parties, both spouses, had an order of protection imposed for a number of months. There were two exceptions in the order of protection, both dealing with physical proximity to each other, one of which dealt with, well, when they dropped off and picked up a 5-year-old child, they were allowed to be within 100 feet of each other. Counsel, did Mr. Gonzalez seek further amendments to the protective order to allow for direct communications for those purposes? No, no. Let me finish the question just to keep the record straight. I think I know what your answer is going to be. Yeah, yeah. Did Mr. Gonzalez seek further amendments to the protective order to allow for direct communications for the purposes of facilitating pick-up and drop-off? The answer is no, never happened. So we have this record as is. And so the two parties themselves sorted it out on their own. Isn't the real question here, rather, that protective order is enforced literally. The agency here, of course, is not the criminal court that would be enforcing having your client suffer for violation. They are applying this order for their purposes to decide whether conduct and pretending exists. Correct. So on the literal reading of the order, there are 5,025 communications, text messages, right? That's correct. So you say to yourself, hmm, that looks bad. So the question is, are there any exceptions? Right? That's the question. And the agency is capable, if it wants to, it can readily recruit exceptions, right? Correct. And so here, what happened was that the OIG, when it did its investigation, looked at the 5,025 and said, hey, let's see if we can break this down in any other way, because your client had said he thought he had right to communicate whether it was on drop-off or canceling. Right. That's correct. And so they ran an analysis. When they ran an analysis, they came up with 1,472 communications. I think that's the number, isn't it? Approximately, yes. Oh, no, it's exactly 1,472. The spouse? The board says, you know, 1,400. The spouse initiated over 1,700 communications. And so the real question is, was there an exception? Your client said he thought there was, but probably thinking was insufficient, but actually the OIG person testified that there were necessary and proper, in other words, necessary and proper exceptions for both the drop-off and the canceling. That's correct. And so what I understood your position was that you thought perhaps that the A.J. looked at this situation and said, I heard the testimony in the case from Jackson, who was the OIG official, and Jackson said it's necessary and proper to have these incidental exceptions. So the OIG ran the numbers, and they came up and said, rather than 1,472, that we're not running the exception. Correct. And their argument and the A.J.'s argument was, well, that's a nice number, but unfortunately it's arbitrary. It is arbitrary. Well, it's arbitrary because what it does is it assumes that all texts and phone messages within the time zones were for that purpose. That's correct. Which is irrational. It also assumes that all the communications outside the zone were not for communication for that reason. That's correct. And that's irrational. And the notion that you were only texting or communicating about picking up the child during the time zone when you were picking up is irrational. Correct. Right. So my view was that the A.J. was correct. As a matter of the agency having decided for itself that it was going to interpret the agreement in order to allow these incidental communications. I agree. I think the language, it's page 151. This is when we realized. Is this only in the record? Excuse me? Yes. This is only page 159 of the records. If you look at page 159, this is the transcript of the agreement. This is in the appendix. This is in the transcript of the agreement. Is it in the appendix? Did you include this argument in this testimony? I'm sorry, Your Honor. Did you include this argument in this testimony in your brief? His testimony? Yes. His testimony that's being cited now. Is it in your brief? Is it in the appendix? I'm characterizing the argument that the presiding judge is correct. This argument that there was an interpretation by the agency of his agreement, you didn't present that? No. Well, the concern is the final order, the board, they're the ones that imposed that arbitrary. That's what I really want to know. If you presented this argument. Not the argument that the OIG did because I consider that to be irrelevant. It's the final board. The final board says, oh, well, every day between 4 and 6 p.m., you guys can communicate. And every Wednesday and Sunday. May I interrupt you for a minute? What about where the board says first, there's 5,025 communicators. The administrative judge erred by not interpreting the protective order correctly. And there aren't the exceptions that the administrative judge thought were there. And then they say, I might have the language wrong, but there's something like at least, even assuming I think was the language, even assuming that we were to take out these communications, there's X communications left. So why is it because the board said, relied on the 525, and then said, even assuming multiple times, why isn't that the board just saying, hey, our front-line answer is there are 5,025 times when they didn't follow And then we're going to make others like belt and suspenders backup arguments. Even assuming that we take out these communications, there's still so many left. Because it doesn't meet the elements of the charge. The charge is conduct unbecoming. There's an intermediate step, and that is, okay, you violated the order more than 1,400 times. The spouse is calling 1,700 times. You violated the order 1,400 times. Okay. It's not charged with violating the order. But my question is, why can't we interpret the board's opinion to say you violated the order 5,025 times?  Because they're still reading it that way. They could have. Okay. They could have, because you know why? It's categorical. There's no contact. Look, sir, your arbitrary and capricious argument, right, depends upon the board having used the 1,372 as the reason for the preponderant evidence. That's right. That's right. So the real question is, when you read the board's opinion, you're saying, well, which of the causal texts was the board relying on for preponderant evidence? If you read, if you look at page A54A and you brought them the brief, but in the board's opinion at A54, the board says, based on the foregoing, and the foregoing is a citation to the OIG data, based on the foregoing, we find latest proof by preponderant evidence that you violated the particular order more than 1,300 times, as charged in Specification 3. That's correct. Specification 3 charged 5,025 connections. So the question is, when I say more than 1,300 times, do they mean that they're saying 1,372 as defined by OIG, or do they mean 5,025? They meant the 1,400. They did not mean the 5,000. How do we know that? Well, the board, well, the board itself subtracted about 2,000. Well, the board did all the math. Right. But that same math was the math that was done by the OIG. And the board earlier in its opinion said the OIG, we disagree with the OIG, the OIG was wrong. Let me ask you this question. To you, did you say it's at most ambiguous as to whether the board was saying more than 1,300 times is 1,472, as opposed to 5,025? Absolutely. Absolutely. They subtracted, arbitrarily subtracting 1,729 communications from the spouse to my client. The point here is. Here's what they say. Even though the order says no contact, it's kind of wrong. No contact. Okay, let's accept that. But the board is saying, you know what, nevertheless, we're going to give you some asylum for contact. So they say. The board never says those words. The board sets the arithmetic up, and then the board says more than 1,300. Right. Now, that means on this base of this record, it can only mean two things. It either means 1,372 or it means 5,025. No, it's 1,472. So it means one of the two. Yes. Don't argue with me, sir. If you look at, you may say more than 1,400 times as charged in specification three. Well. Just a second. On page 8 there. On page 8. 5,054. That's the key decision. There has to be preponderant evidence, right, in this case of violations of the order, in order to sustain the charge. Preponderant evidence. The board has pointed and said we need preponderant evidence. So the board is even choosing when it says more than 1,300 times. It has referred to 1,472. It's also referred to 1,400. So what I'm saying is that it makes a difference whether we read this to say more than 1,300 is 1,472 or 5,025. If it's 5,025, your case is over. If it's 1,472, you have an argument which you did preserve that the numbers are arbitrary. Correct. So on page 8, appendix 53, the board says there were still 1,472 communications that originated from the appellant that fell outside of the scope of the protected orders exceptions. That is the charge. Can I ask you something? What do I do with the language that says even if, for the purposes of our analysis, we subtracted 1729? I mean, they're talking about even if, not showing that they are, in fact, doing it. The answer, the overall answer to that is that the board found the client, Gonzales, acted in good faith. Wouldn't we see no malicious intent? What you have to understand is when a decision goes from the A.J. to the fair board, whether prompted by the individual or prompted by the agency, it's a brand-new case. And the board is free to do whatever it wants with one exception. If there is a demeanor-based credibility call by the A.J. Demeanor-based, I don't mean based on the A.J. Which we have here. If there is a demeanor-based, then the fair board has to accept it unless they find good reason not to. Right. Right. We have that here. I understand that point. Right. But I still harp on the point to say the question is whether or not the board's failure of us is ambiguous as to which public texts and calls it relied on to claim pro bono evidence. 1,472. What about the language in the order at, I mean, at page A52 at the bottom where they say, you know, we agree with the agency that the language of the protective order is clear and the administrative judge improperly interpreted the protective order and its exceptions and then goes on to say that the protective order, top of the next page, 53, clearly and unambiguously sets forth the stay away. The proposal notice documented the high value of communications that violated the protective order. And the proposal notice doesn't have these exceptions that we're talking about today. And so how is this not a holding from the board that they're holding all 5,025 to be violations of the protective order? Well, because if you analyze their opinion from page 51 on, they've already excluded, they've accepted basically the administrative judge's ruling that only approximately 1,400. I don't see that. I mean, certainly you can't say that, because when they say even if the purposes of this analysis, but that's what they're saying, even if we take it out, as far as 1,472. Mr. Fisher, if you could put note in particular on appendix page 54. Yes. It talks a lot about decision to sustain specification three of the conduct on becoming a federal law enforcement officer charged in the charge itself. We may not address the agency's arguments on, et cetera, et cetera. And then when you go back to look at specification three, it is referring to the 5,025 records, right? Specification three on appendix page 109. So I think it correlates and actually supports up some of what I thought Judge Sterr was just asking about. Well, I feel that the final board, since they're part of the whole administrative process, they certainly can modify and criticize what the agency's done. So if they modified that proposal and they were only upholding 1,472 communications, then we're bound by that. That is the question, is what were they upholding? Is it 5,025? And I understand your position. I don't know how you can – I don't know. Do you have any further questions?  Okay. Why don't we show it to the government and you can have some time for rebuttal. Okay. Thank you. Ms. Koenig. Could you help us out on trying to decide on page 54 of the grades of assertion? Do you have it with you? I do, yes. Okay. When you say violated – propounded evidence violated Fitman more than 1,400 times. So does – did they really mean to say 5,025? Your Honor, I think that if you look to page 50 and 51 of the appendix, I think that the board's decision can be read to have sustained – can you see the Fitman on section on page 53? Yeah, I do, Your Honor. But I'm looking specifically at page – the top of page 51 where the board says, we find that the agency proved specification three and the charge of conduct in becoming a federal law enforcement officer by preponderant evidence. And again, specification three, as also indicated on page 51, specification three alleged that between those two time periods or between this time period there were 5,025 records of communication. What does that mean in English? It's the last paragraph of page 51 of the appendix. It says specification three alleged that there were 5,025 records of communication in violation. My only question is where this ambiguity arises from the fact that the agency referred to more than 1,300 times, they don't say 5,025. Well, Your Honor, again, as Judge Stoll pointed out a minute ago, the beginning of the paragraph about 1,472 communications starts off with even if for the purpose of our analysis we subtracted these other communications, there are still a minimum of over 1,400 that do in fact violate the protective order. And even considering these exceptions, which the board found were limited exceptions, there is no exception for communication regarding picking up the child. Well, we will say there is no exception. What do we do with the testimony by Jackson? Jackson is an RIG official who is doing the analysis on the opinion. And Jackson is asked with regard to whether there should be some incidental exceptions. And Whitney had actually been in conduct on becoming an officer just to drop the kid off. You're familiar with the record? I am, Your Honor. So he went on to ask whether as an incident to the regular exception for drop-off there was a further rule for the communications, would it be necessary and proper? And the witness said yes. And then he was asked whether it was necessary and proper to have incidental communication in the counseling. And again, Jackson said yes. Do you recall that testimony? If that's the testimony, was that at 159 of the appendix? Yes. Which is not in the joint appendix. Pardon me? But I believe that testimony is not. It's in the record. I mean, I'm reusing it from the transcript of the hearing. It's not in the joint appendix. The transcript of the hearing is, I believe, in the record, is it not? It is in the general record, not in the joint appendix. Pardon me? It's not in the joint appendix. Not at all? I don't believe that particular passage is. Some of the testimony is. Just so you know, if you want to know for later purposes, Ms. Jackson's testimony is at page 180. 180. Okay. 180? I think. Well, Jackson, this is cross-examined. Jackson testified for quite a while. And so Jackson is testifying. Jackson was, of course, also asked whether there's anything literally in the order that provides for exception. She said no. Right? So it's clear that there's no question that the order itself has no exception for incidental communication. No question about that. Agreed, Your Honor. The question is whether or not the agency chose to create an exception when the witness testified that it was necessary and proper for there to be some communication on pick-up, drop-off, and on counseling. Your Honor, the board in its decision found that the language of the protective order was clear and did not provide for the broad exceptions that the appellant has argued for in this case. Did the deciding official find the same thing? Yes. What was the deciding official's view on the exceptions to the protective order? The deciding official or the agency, I think I believe it was the deciding official, also found that the language of the protective order itself was clear. The protective order is in the record at Appendix 187, and it provides for no communication exception. Okay. What was the basis for the administrative judge's decision? I'm just curious. Your Honor, the agency, I think, in trying to understand the likely nature of this large number of communications, had drawn these lines about pick-up and drop-off and about the communications relating to counseling. And, you know, in drawing these lines, determined that a number of these communications, over 1,400 of them, were outside these reasonable timeframes for communication and child pick-up. But the administrative judge, I think, was looking to the fact that we don't know the nature of the communications. The QIG, the Inspector General Report investigating this conduct, was not reading the communications or listening to transcripts of the communications that Mr. Gonzalez has with his wife during this period of time. So, you know, that investigation, which analyzes the communications at Appendix 164, really concludes that it's unlikely, improbable, that these communications related to child pick-up and to counseling, even if you were to read in a broader exception, which we all agree the plain language of the protective order does not support. But just so I can better understand what is meant by the order that talks about sustaining Specification 3. Are you indicating or is your interpretation that what's meant is sustaining the 5,025 alleged violations, or is it a lesser number? Well, Your Honor, I guess I would disagree that they have to explicitly uphold all 525,000 or 1,472. 5,025. Yeah, sorry, 5,025. Yes, the Long v. Social Security case that we cited in the brief, you know, talks of proving that the substance of the specification. The problem with this, the problem with what you're saying is that, I mean, that's a fine answer, and that's your answer. But the point is that if we can discern how many, what the board was holding, then the arbitrary and capricious argument doesn't have less. Correct, yes. But if we can't discern, then there's something to it. So what do we do with that? But it's your view that we don't have to make that determination. But I don't know that I agree with you on that.  Well, Your Honor, I believe that the board's finding on 51 saying that the agency proved Specification 3, which we all, I think, agree, the specific language of Specification 3 was that there were 5,025 communications in violation of the protective order. That's true, but they go on specifically on page 54, then, to identify the very preponderant evidence. So when you say the language on the top of page 5, right, doesn't answer the question because of the relevant look. And they said over here on page 8, more than 1,400. If they had literally meant what they said on page 51, they would have said, not more than, they would have said, violator 5,025 times. So my question is, isn't there some possibility of a little ambiguity here? Your Honor, I, there is a possibility. There must be preponderant evidence, and the question here is very clear. Was it 1,417 preponderant offenses, or were there 5,025? And when the board has given credence to the 1,372 by citing the OIG run-up for that number, when they say more than 1,300, what are they trying to tell me? Well, that's my job, because if they told me 5,025, I knew exactly what to do. If they told me 1,472, there may be something else they need to do. In many, in cases in the past where there's been some ambiguity or lack of clarity in board decisions, where it matters for the life of a federal government employee, we've reminded the case both precedentially and non-precedentially and asked the board to explain. Would that be inappropriate in this case? Your Honor, I believe it would be unnecessary in this case. If you didn't ask whether it was unnecessary, would it be inappropriate? I think it would be, I think it would be inappropriate to... Ask them to tell us which they meant? Well, I think the implication, like the outcome of that would be... Real easy, if the board meant 5,025, we'd send it right back and New York made it 5,025, see? Well, Your Honor, I believe that the board has already said this. That's what we believe they've said. But you said they've already decided it. Why? For the reasons you gave us, or do you have additional reasons? No, Your Honor, I... Is it 50, just 50 and 51, or is there more? No, I believe that it's 50 and 51 where they uphold Specification 3 and then go on to say that even assuming language and where they're discussing the exceptions to the protective order and how broadly they could be or not be construed. I think that the board here has found, upheld Specification 3, and I think that there is substantial evidence in the record that Mr. Gonzales has never disputed the 5,000... I'm sorry, I want to ask you one thing before I forget about it, which is there's this 4 to 6 p.m. time frame that's discussed about and is argued as being arbitrary by Mr. Gonzales. Do you know where that comes from? From my understanding of the record, it may have come from what was reported to the L.A. Superior Court by Mrs. Gonzales about what she needed in order to have support for the 5-year-old child during this time period where the protective order was in place. Am I correct about that? Your Honor, I apologize. I don't know the reasoning behind the 4 to 6 time period. I think it was the agency's attempt to determine which communications were likely to relate to child pickup. I don't think the 4 to 6 was in the record, clearly, because those would be typical times when the drop-off occurred, depending on the circumstances. That I agree with, Your Honor. I just don't know whether it was specifically from Mrs. Gonzales. I believe it came from discussion way back in front of the permanent judge. Correct. Yeah, I don't know where that originated from. But, yes, the agency had looked, or had removed the communications... Your Honor, I guess you want the board to say that the board opinion is absolutely clear that 11,300 means 5,025? I think given the preceding analysis at 50 to 53... The reasoning that people rendered about what they meant? Your Honor, given that the agency, or that the board, upheld the specification 3, which specifically stated that 5,025 number, I think the board's decision can be read to... But it does not say the point of evidence of 5,024? Well... I mean, any number in the record that correlates to more than 1,400 is 1,472, correct? Well, 5,025 is... 5,025 is the only number that correlates to 1,300 in the board opinion. Yes, 1,427. 1,427 is not around 1,400, correct? Correct, yes. But, Your Honor, on 51, the board also finds that the agency proved specification 3 by preponderant evidence. There's that same finding, if you're really... That's what I pointed out to you, the very same statement comes out on 54, when we actually identify the cause that are the preponderant evidence. Yes, Your Honor, I... Thank you. Yes. And, I mean, this has been the focus, has been on the violation of the protective order. I'm happy to address the nexus if Your Honors have questions. Well, just a minute. Would you agree that if the agency wished to interpret the protective order in a different way than it was written, they're free to do so? The agency's not enforcing the order criminally, right? That's correct. This isn't about a criminal case. If the agency wanted to cut some slack in these time zones, it was free to do so? Yes, Your Honor. I think we've argued that it was not arbitrary and capricious to look to the communications that were specifically outside of certain time periods and contexts. I guess more time periods. Well, I mean, you're not... The argument that it was arbitrary, that the time frames were arbitrary and capricious, you don't respond to that. Because, as you heard earlier, when you set up those time frames, you're assuming that all texts and calls were in a time frame for that purpose and that all that are outside aren't. I think the agency was finding it likely that the ones during that time period were within and outside of it unlikely to be related. But, again... If they're likely and unlikely, it won't produce proponent evidence, will it? Well, I think unless you're reading the substance of the communications, there was no other way for the agency to... Well, what do you mean? All they have to do is read them. They made no attempt to read them. The text messages disappeared after 30 days. They were able to get the actual text message of all the phone calls, but they made no attempt to look at them. Right, because, again, all of the... Because they made assumptions. Correct, Your Honor, because they're starting from the assumption that all of the communications violated... But the two of those were available if they wanted to read the text messages. I assume but don't know for sure that that was the case in this. Well, I know you haven't read the records carefully, Your Honor, but it is clear that the text of the phone calls were available, and no attempt was made by anyone in RIG to look at the actual substance of any of the calls or texts. That's my understanding, Your Honor, yes. Before we sit down, could you briefly touch on the issue of penalty and whether or not the board should have considered Mr. Gonzalez's intentions within the communications in terms of the penalty analysis? Well, Your Honor, the agency did consider the Douglas factors, and I think that especially as part of the potential for rehabilitation, the agency concluded that Mr. Gonzalez's statements that he wasn't violating the protective order should be actually counted against his potential for rehabilitation. But I think ultimately the agency concluded and the board upheld that the nature and the seriousness of the offense, especially given his position as a law enforcement officer, as an inspector general employee, and given his noncompliance with the standards for integrity and character, that the removal was the appropriate penalty. And so unless Your Honors have further questions, we would ask the court to affirm the Merit Systems Protection Board decision. Okay. Thank you, Ms. Koenig. Mr. Grover, you can have two more minutes. Thank you very much. Just for clarification, on page appendix 53 of the final order, in the paragraph on top that starts with, as noted, at the end, the board found that the agency identified in the proposal notice 3,201 communications that violated the protective order. That's where the 3,201 comes from. And they subtracted 1,729 that was initiated by the spouse. So I'm left with 1,472. And quite frankly, that should clear up the ambiguity. Where's the proposal notice in the record? Well, that's, we'd have to find that in the appendix. What are you talking about? I mean, that's what the. . . No, it does. Okay, then I did not follow your argument.  Just saying that the final board has found, that I think is binding, that the proposal notice noted at 3,201. Yes, but all they're saying is the agency identified. Yeah. That's clearly, that's what IG's analysis was. I understand. So that gives more credence to the analysis that only 1,472 communications were at issue here, and that's what they sustained. And I don't want to lose the forest for the trees, because ultimately the standard is, okay, we have a finding of good faith. At most, he made a mistake, maybe. But how does that detract from his character and his reputation? That's what conduct unbecoming is. And that's what the agency didn't find. Well, the agency laid out in its proposal to remove the removal notice that someone who violates a criminal order may lack faith in their ability to comply with orders, to carry out orders, et cetera. Yeah. Well, I still say that if somebody is acting in good faith, someone has made a mistake. They did not take that into consideration. Sure. But, sir, your client was represented by counsel in front of a criminal judge on the hearing. Your client was clearly concerned about the ability to communicate at or about his 5-year-old daughter, right? Correct. And he expressed in front of the judge, he said, we need some exceptions. And there were those negotiated exceptions, and the exceptions weren't broad enough. That's right. Right? That's right. Whatever happened, happened, right? That's correct. Would it have been better or not? I understand that, but it doesn't mean that his ability to be a law enforcement officer is undermined by making a good faith error. That's my point. Thank you. Thank you. We thank counsel for the cases submitted. Thank you, sir. And we adjourn for the day.